IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN R. CAPUTO,

        Plaintiff,

vs.

BP WEST COAST PRODUCTS, LLC,

        Defendant.

        Civ. No.  S-11-722 KJM GGH

        ORDER

        Plaintiff, a franchisee of defendant, has filed suit against BP West Coast Products (BPWCP) under the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. §§ 2804, et seq., alleging violations of the act stemming from defendant's intent to sell the gas station currently operated by plaintiff to third parties.

        Defendant has filed a motion for summary judgment, contending that its effort to sell the gas station complied with the PMPA and that the terms of the operative Right of First Refusal (ROFR) did not violate the PMPA.  The court has sealed a number of documents relating to the third party buyers and some internal business decisions and will refer to the buyers throughout this order as Buyer One and Buyer Two, or simply "Buyers."

/////

1

The court heard argument on the motion on March 9, 2012. Jeffrey Hamerling and Alissa Pleau-Fuller appeared for defendant; Peter Lagarias appeared for plaintiff. For the reasons explained below, defendant's motion is GRANTED.

I. UNDISPUTED FACTS

Plaintiff John R. Caputo operates an ARCO-branded retail service station facility and an *am/pm* mini-market located at 2933 65th Street, Sacramento, California ("Facility"). P.'s Response to BPWCP's Statement of Undisputed Facts[1] ECF No. 43-1 ¶ 1. This real property is owned by BPWCP. *Id.* In 2010, after conducting a thorough review of its retail service station facilities, including *am/pm* convenience stores in a number of West Coast metropolitan markets, and carefully considering various economic, financial, and competitive factors, BPWCP made a business decision to sell the underlying real estate and equipment at 28 facilities, some of which included *am/pm* stores in a number of those markets. *Id.* ¶ 3

On September 28, 2010, BPWCP notified plaintiff in writing that it had tentatively identified the Facility as one that "might be better operated as a dealer-owned facility instead of the company-owned facility that it is today." *Id.* ¶ 5. BPWCP retained an appraiser to determine the approximate market value of the Facility for the purpose of determining the minimum bid amount it would set. *Id.* ¶¶ 7-8; Declaration of Gary S. Heitlauf, ECF No. 30-4 ¶¶ 4-5.[2]

BPWCP retained a real estate marketing firm, NRC Realty & Capital Advisors, LLC ("NRC"), as its agent for the purposes of obtaining sealed third-party bids for the Facility and other BPWCP facilities. *Id.* ¶ 10. NRC marketed the facilities to potential buyers. *Id.* ¶ 11. Before submitting their bids, all potential buyers pre-qualified following pre-established NRC procedures, by attending a NRC-conducted bid webinar and providing information regarding their business background, credit history and financial resources. *Id.*

---

[1] The court adopts those facts plaintiff does not dispute.

[2] Plaintiff partially disputes this fact, arguing there is no showing that the appraisal was accurate. ECF No. 43-1 ¶ 7. The court discusses this issue more fully below.

2

NRC conducted the bidding process in December 2010. The Buyers, who were pre-qualified, submitted a signed purchase agreement and provided a deposit of 2.5% of the proposed purchase price with their bids as required by the NRC bid procedures. ECF No. 43-1 at ¶ 21. In December 2010, NRC sent a letter accepting a $1.12 million offer on the Facility from a third Buyer on behalf of BPWCP. *Id.* ¶ 15. Upon BPWCP's acceptance of their bid, Buyers increased their deposit to 5% in accordance with the NRC bid procedures. *Id.* ¶ 22.

On or about January 5, 2011, BPWCP sent plaintiff a "Notice of Nonrenewal" of Plaintiff's Franchise Agreement ("Notice"), citing specific portions of the PMPA, effective once it expired on its own terms on January 1, 2012, and also enclosed a summary statement of the PMPA with the Notice. *Id.* ¶ 23. The Notice also offered to Plaintiff a right of first refusal ("ROFR") that allowed plaintiff to purchase the Facility. *Id.* ¶ 25.[3]

On or about February 16, 2011, plaintiff notified BPWCP that he intended to purchase the Facility and was exercising the ROFR "under protest." *Id.* ¶ 27. The purchase agreement signed by plaintiff – the Bid Real Estate Sale Agreement – obligates BPWCP to "assess, monitor, and perform corrective action . . . to levels appropriate for gasoline station use . . . on any Pre-Closing Contamination" as required by the appropriate environmental regulatory agency, among other things. *Id.* at ¶ 28; Real Estate Settlement Agreement, ECF No. 30-9 ¶¶ 12.1-12.2.[4] Following plaintiff's acceptance of the ROFR, BPWCP cancelled the purchase

---

[3] As discussed below, plaintiff disputes that the ROFR was on the same terms as those extended to the Buyers.

[4] Plaintiff disputes this characterization, saying that the purchase agreement contains "as is" language and no indemnification provisions. ECF No. 43-1 ¶ 28. He cites to paragraphs 14-16 of his own declaration, which recount his earlier efforts to get a loan to buy the property, and bankers' advice that he would need an indemnification letter and BPWCP's refusal to provide such a letter. He also relies on "exhibit C" attached to his declaration, which is a copy of the Real Estate Settlement Agreement, approximately twenty pages long in small type. As he does not direct the court to any specific section containing the alleged "as is" condition, he has not provided sufficient information to establish that this fact is disputed. *See Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028-29 (9th Cir. 2001) ("whatever establishes a genuine issue of fact must *both* be in the district court file *and* set forth in the response"; a party must bring its evidence to the court's attention because a district court is not

3

agreement with Buyers. *Id.* at ¶ 29.

## II. SUMMARY JUDGMENT STANDARDS

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[5]

The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . .; or show [] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts."). Moreover, "the requirement is that there be no *genuine* issue of *material* fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

/////

---

required to comb the record to find some reason to deny summary judgment). (Emphasis in original.)

[5] Rule 56 was amended, effective December 1, 2010. However, it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains unchanged." FED. R. CIV. P. 56, Notes of Advisory Comm. on 2010 amendments.

4

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

III.  THE PMPA

In enacting the PMPA, Congress sought to balance the "bargaining power between distributors of petroleum products and their franchisees by giving franchisees certain protections from arbitrary termination or nonrenewal." *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1390 (9th Cir. 1986) (citation omitted). The PMPA governs two aspects of a petroleum franchise relationship: "the circumstances in which the franchisors may terminate a franchise or decline to renew a franchise relationship." *Mac's Shell Service, Inc. v. Shell Oil Products Co.*, ___ U.S. ___, 130 S. Ct. 1251, 1259 (2010).

"The PMPA prohibits a service station franchisor from terminating or declining to renew an existing franchise relationship unless one of the conditions set forth in 15 U.S.C. § 2802(b) has been satisfied. *BP West Coast Products LLC v. May* (*May II*), 447 F.3d 658, 662-63 (9th Cir. 2006). "[A] franchisor may decline to renew a franchise agreement . . . and decide to sell such premises if such 'determination [is] made by the franchisor in good faith and in the normal course of business.'" *Id.* at 663 (citing 15 U.S.C. § 2802(b)(3)(D)(i)(III)). If the premises are leased, "a franchisor must 'either: (I) make a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or (II) if applicable, [offer] the franchisee

a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.'" *Id.* (quoting 15 U.S.C. § 2802(b)(3)(D)(iii)).

In an action under the PMPA, the franchisee has the initial burden of showing that his franchise was not renewed; the burden then shifts to the franchisor to show that the non-renewal was proper under the Act. *Anand v. BP West Coast Products LLC*, 484 F. Supp. 2d 1086, 1094 (C.D. Cal. 2007) (citing *Reyes v. Atlantic Richfield Co*, 12 F.3d 1464,1469 (9th Cir. 1993)). As there is no dispute that plaintiff's franchise was not renewed, it is defendant's burden to establish that its reasons complied with the PMPA.

   A. Good Faith

A franchisor may decline to renew a franchise agreement only "in good faith." 15 U.S.C. § 2802(b)(3)(D)(iii). "The good faith requirement looks to whether the franchisor's action are designed to conceal selective discrimination against individual franchises." *Unocal Corp. v. Kaabipour*, 177 F.3d 755, 767 (9th Cir. 1999) (quoting *Southern Nevada Shell Dealers Ass'n v. Shell Oil Co.*, 725 F. Supp. 1104, 1109 (D. Nev. 1989)). The purpose of this good faith requirement is "to preclude sham determinations from being used as an artifice for termination or non-renewal." *Valentine v. Mobil Oil Corp.*, 789 F.2d at 1392 n.7 (quoting S.Rep. at 37, reprinted in 1978 U.S.Code Cong. & Ad. News at 895--96). Accordingly, "courts have . . . inquire[d] into good faith without engaging in judicial second-guessing of the economic impact of an otherwise legitimate business decision by the franchisor." *Kaabipour*, 177 F.3d at 767. "The test for determining good faith is subjective, and the court should look to the franchisor's intent rather than the effect of the franchisor's actions." *May II*, 447 F.3d at 663.

Plaintiff attacks BPWCP's evidence of good faith on two grounds:  irregularities in the bidding process and BPWCP's failure to disclose contamination at the site and other conditions of sale during the bidding process.

/////

/////

i. Bidding Irregularities

Plaintiff contends that the decision to sell the Facility came only after BPWCP targeted the Buyers to increase their offer because their initial offer, which was the highest, did not meet BPWCP's minimum bid price. *See* Deposition of Samantha Steiner, ECF No. 44-1 at 39:24-25 to 40:1 (BPWCP asked NRC to approach the Buyers about increasing their million dollar bid to $1.12 million, which was "the number .... they needed to sell the site"); *id.* at 40:24-27; Deposition of Buyer Two, ECF No. 44-2 at 82:24-25 to 81:1-10 (NRC representative told buyers their bid would be rejected unless it was raised); *see also* ECF No. 38-1 at 46:1-24 (sealed) (minimum bid levels). Plaintiff has also presented evidence that of the twenty-eight properties BPWCP put up for sale, it awarded acceptance bids for only eleven of them. ECF No. 44-1 at 38:10-25-39:1-18.

Although the Ninth Circuit has recognized that "procedural irregularities" might provide evidence of bad faith "in the initial decisionmaking to sell the facilities," it has not considered whether irregularities in the bidding process are relevant to the good faith inquiry. *May II*, 447 F.3d at 664. Another court from this district has concluded, however, that "absent a requirement that the court must also review the bidding process in determining good faith and in the normal course of business, the court is not inclined to add this requirement." *BP West Coast Products LLC v. Greene*, 318 F. Supp. 2d 987, 996, *aff'd*, 178 Fed.Appx. 706 (9th Cir. 2006) ("Greene"); *see also BP West Coast Products, LLC. V. May*, 347 F. Supp. 2d , 898, 906 (E.D. Cal. 2004, *aff'd*. 447 F.3d 658("May I). Without more in this case, the court cannot conclude that BPWCP's notifying the Buyers that their bid would be rejected unless increased to meet BPWCP's minimum bid requirements suggests that BPWCP's initial decision to include the Facility among the group of twenty-eight it hoped to sell was made in bad faith. *See Kaabipour*, 177 F.3d at 767 ("So long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal, the franchisor has met the burden required by the PMPA for determining good faith.") (internal quotation marks, citation omitted).

ii. Other Evidence

Plaintiff further argues that BPWCP did not act in good faith because it failed to state clearly what was for sale and to notify potential buyers about contamination on the site. ECF 43-1 ¶ 6. He has provided evidence that the Buyers were unaware, for example, that they would have to purchase the license for beer and wine sales separately. Lagarias Decl., Ex. E, Buyer 2 Deposition, ECF No. 44-2 at 62:18-23. Plaintiff also points to the evidence mentioned above concerning the Buyers' possible ignorance of the potential environmental problems with the cite *See* ECF No. 44-3 at 62-69. While it may be possible that potential environmental problems with the site factored into BPWCP's decision to sell the Facility, plaintiff has pointed to nothing suggesting that the decision to sell, even if prompted by environmental concerns, equals discrimination against this particular franchisee.

Plaintiff also argues that the evidence of contamination shows that the fair market value – what a willing buyer would pay a willing seller in the open market – is less than BPCWP sought in its bidding process, which in turn will show that its offer to sell was not made in good faith. He provides little explanation of the relationship between the alleged overvaluation and BPWCP's decision to sell the facility, but rather argues that his evidence at trial will demonstrate the connection. ECF No. 43 at 14.

Under the PMPA, the concept of fair market value is relevant to determining whether a franchisor has made a bona fide offer to sell the premises to the franchisee, something not at issue in this case, as explained below. *See, e.g., Ellis v. Mobil Oil*, 969 F.2d 784, 787-88 (9th Cir. 1993) (a bona fide offer is measured by an objective market standard; to be objectively reasonable an offer must approach fair market value); ECF No. 38 at 19 (sealed) (BPWCP's appraiser notes that valuation may change based on remediation for contamination). However, "[t]he fair market value of any one property is a flexible concept. . . : '[T]here is no universally infallible index of fair market value.'" *Arnold v. Amoco Oil Co.*, 872 F. Supp. 1493, 1500 (W.D. Va. 1995) (quoting *Amerada Hess Corp. v. Commissioner*, 517 F.2d 75, 83 (3d Cir. 1975)). If

this inquiry is relevant to a determination of good faith, plaintiff has not presented enough evidence to show there is a disputed issue of material fact sufficient to defeat summary judgment. In light of the flexibility of the concept, BPWCP's decision to rely on a particular value for the property does not undercut its showing that its decision to sell the Facility was made in bad faith.

B. Normal Course of Business

In addition to meeting the good faith requirement, a franchisor must show its decision to terminate a franchise agreement was made "in the normal course of business." 15 U.S.C. § 2802(b)(3)(D)(iii). A franchisor meets the "normal course of business" requirement if the determination was "the result of the franchisor's normal decision making process." *Valentine*, 789 F.2d at 1392 n.7. Evidence of good faith might be indicative of decisions made in the normal course of business. *May II*, 447 F.3d at 663 (quoting *Beck Oil Co. v. Texaco Ref. & Mktg., Inc.*, 25 F.3d 559, 562 (7th Cir. 1994)).

The facts are undisputed that BPWCP decided to terminate its franchise agreement with Plaintiff "after conducting a thorough review of its retail service station facilities." ECF No. 43 ¶ 3; *see* ECF No. 38 at 5-8 (sealed). The facts also are undisputed that BPWCP came to the decision after considering "various economic, financial, and competitive factors" and concluding that sale of the Facility was a strategic decision. *Id.* These facts show that BPWCP's decision to sell the Facility came after a routine review of its business plan. Furthermore, the above finding that BPWCP made the decision to sell the Facility in good faith indicates BPWCP decided to sell the Facility in the normal course of business.

C. Bona Fide Offer or Right of First Refusal Requirement

If a franchisor decides to sell a leased marketing premise, that franchisor must either (1) "make a bona fide offer to sell, transfer, or assign franchisor's interest;" or (2) "offer the franchisee a right of first refusal." 15 U.S.C. § 2802(b)(3)(D)(iii). The right of first refusal (ROFR) must be extended to the franchisee within the 90 day period following notice of non-renewal of the franchise and the ROFR must be of forty-five days duration. 15 U.S.C.

1  § 2803(b)(3)(D)(iii)(I)-(II).  The election whether to make a bona fide offer to sell or extend a
2  right of first refusal  "is lost only if it is impossible or impracticable to give a right of first
3  refusal." *Dhillon v. Chevron Products Co.*, No. C004095, 2000 WL 35799760, at *4 (N.D. Cal.
4  Dec. 5, 2000) (citing *Ellis v. Mobil Oil*, 969 F.2d at 785). If a franchisor offers a franchisee a right
5  of first refusal, that franchisor needs to not make a bona fide offer to sell, transfer, or assign
6  franchisor's interest. *See Greene*, 318 F. Supp. 2d  at 998. "Neither the statutory text nor any case
7  law suggests that a court is to review the commercial reasonableness of ROFR terms."
8  *Armaswalker v. Equilon Enterprises LLC*,  472 Fed. Appx. 484, 486 (9th Cir. 2012).

9  Plaintiff does not dispute that the ROFR was timely made or that it was held open
10 for forty-five days.  Rather plaintiff argues that the proffered grant deed to the Buyers did not
11 convey all of BPWCP's interest in the property because it contained a variety of restrictions on
12 what could be built.  ECF No. 43-1 ¶ 47 & ECF No. 38-1.   He also argues that because the
13 Buyers were not ready, willing and able, the ROFR was improper.

14 i. Ready, Willing And Able Buyer

15 Plaintiff has presented evidence showing that the Buyers had not secured a loan to
16 purchase the Facility before their bid was accepted and that given the contamination on the site,
17 there was little possibility of their securing a loan to purchase the Facility.  Declaration of C.J.
18 Lynden, ECF No. 45 ¶¶ 4, 8, 15-19 (consultant for gas station borrowers opines that Buyers
19 would not have been able to secure a million dollar loan for the Facility because the
20 contamination is commingled with that on another site, because the clean-up costs have not been
21 calculated as yet, and because BPWCP has refused to provide indemnification).  He has also
22 produced evidence of the Buyers' communications with NRC about their potential difficulties in
23 securing a loan in light of the contamination issues.  *See* Lagarias Decl., Exs. 26-29 ECF No. 44-3
24 at 62-69 (e-mails).

25 /////

26 /////

Although the PMPA does not use the term "ready, willing and able" buyer[6], the Ninth Circuit appears to recognize that the concept may have some bearing on the determination whether a sale comports with the PMPA; in *May II*, however, the court concluded that a ready, willing and able buyer is one who complies with the requirements of the bidding process, which included, in that case as well as in this one, a bid deposit equal to 2.5% of the sale price, followed by an increased deposit following a successful bid. *MayI*, 447 F.3d at 665. The court rejected the claim that the buyer was not "ready, willing and able" because he had not secured a loan before BPWCP's conditional acceptance of his bid. *Id*. at 664-65; *Greene*, 318 F. Supp. 2d at 996 (E.D. Cal. 2004) ("The fact other franchisees were given ROFR based on third party bids even though the third party was not willing and able to pay the bid does not show any bad faith.").

Even if potential difficulties in qualifying for a loan are a proper consideration, plaintiff's evidence does not create a disputed issue of material fact, given defendant's evidence that the Buyers had other sources of cash for the purchase. *See* Hamerling Declaration, Ex. D, Application (sealed) ECF No. 38-1 at 6-12; Ex. H, Deposition of Buyer 2, ECF No. 38-1 at 61: 13-21 (sealed).

ii. Failure To Transfer Complete Interest; Restrictions

Plaintiff first argues that the ROFR does not comply with the PMPA because BPWCP did not offer to transfer its complete interest to the Buyers but rather restricted some uses on the property. *See* ECF No. 43-1 ¶ 47 (the grant deed to the third party buyer contained several restrictions). The requirement of an "offer to sell, transfer or assign. . .such franchisor's interests in such premises" is contained in the provision regarding the franchisor's bona fide offer to the franchisee, not the franchisor's agreement with third party buyers. 15 U.S.C. § 2802(b)(3)(D)(iii)(I). Plaintiff cites nothing suggesting that this requirement has any

---

[6] In real estate, the phrase connotes "a prospective buyer of property who is legally capable and financially able to consummate the deal." Black's Law Dictionary (9th ed. 2009).

1 application to the ROFR, but even if it does, the purpose of the bona fide offer is to allow
2 franchisees "to continue operating their facility as a service station if they exercise their right to
3 buy." *Ellis v. Mobil Oil*, 969 F.2d at 787.   None of the restrictions plaintiff has noted interferes
4 with his ability to operate the Facility as he had been doing.
5     Plaintiff also challenges BPWCP's reservation of mineral rights.   ECF No. 43 at 17.  It is
6 not clear whether he alleges that this reservation was imposed on the Buyers, because he has not
7 pointed the court to different provisions regarding mineral rights in the two agreements.
8 Nevertheless, assuming that this provision differed, it does not defeat the validity of the ROFR. A
9 third party offer may "comply with Section 2902(b)(3)(D)(iii)(II) if the deal given to the third
10 party differs from the exact arrangement offered to the franchisee." *Arnold*, 872 F. Supp. 1493,
11 1499 (holding that it is acceptable when a franchisor offered to sell to a franchisee two facilities
12 with no supply agreement but offered to sell to a third party buyer facilities with an supply
13 agreement).  Plaintiff has presented nothing suggesting that the reservation of mineral rights
14 obligated him to pay more, had any other financial impact on his acceptance of the ROFR, or
15 interfered with his ability to continue to operate his service station.  *See Anand v. BP West Coast*
16 *Products*, 484 F. Supp. 2d at 1099 (reservation of mineral rights does not interfere with ability to
17 run a service station).
18     IT IS THEREFORE ORDERED that defendant's motion for summary judgment
19 (ECF No. 30) is granted.
20 DATED: September 25, 2012.

UNITED STATES DISTRICT JUDGE